AO 106 (Rev. 4/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
### EASTERN DISTRICT OF WISCONSIN

*In the Matter of the Search of*
Information associated with Facebook User ID "Lucky Lee" https://www.facebook.com/lee.hueckstaedt that is stored at premises controlled by Facebook Inc.

Case Number: 17-M-1251

## APPLICATION & AFFIDAVIT FOR SEARCH WARRANT

I, Neil McGrath, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Information associated with Facebook User ID: "Lucky Lee" https://www.facebook.com/lee.hueckstaedt that is stored at premises controlled by Facebook Inc., and further described in Attachment A to the Affidavit in Support of Search Warrant

located in the Northern District of California there is now concealed: Evidence of violations 21 U.S.C. Sections 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance), as further described in Attachment B to the Affidavit in Support of Search Warrant.

The basis for the search warrant under Fed. R. Crim. P. 41(c) is (check one or more):
  X evidence of a crime;
  ☐ contraband, fruits of a crime, or other items illegally possessed;
  ☐ property designed for use, intended for use, or used in committing a crime;
  ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

21 U.S.C. Sections 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance)

The application is based on these facts:
  ✓ Continued on the attached sheet, which is incorporated by reference.
  ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*
Name and Title: Neil McGrath, Task Force Officer, Drug Enforcement Agency

Sworn to before me, and signed in my presence.
Date 5/9, 2017

City and state: Milwaukee, Wisconsin

*Judge's signature*
THE HONORABLE WILLIAM DUFFIN
United States Magistrate Judge
*Name & Title of Judicial Officer*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Neil McGrath, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am employed as a Special Agent with the State of Wisconsin Department of Justice Division of Criminal Investigation (DCI), and have been a full-time sworn law enforcement officer for over 20 years. I am currently assigned as a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) Tactical Diversion Squad (TDS). I have extensive training and experience in controlled substance trafficking investigations. As part of my duties as a DEA TFO, I investigate criminal violations relating to narcotics trafficking offenses, including, but not limited to, violations of Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. Based on my experience at DCI as a Special Agent and as a DEA TFO:

   a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

c. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, oxycodone, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e. I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking;

f. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials; and

g. I know that drug traffickers often use rental vehicles to avoid detection by law enforcement officials.

h. I am familiar with the language utilized over the telephone and other modes of communication to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

i. I know that drug traffickers often use electronic equipment, such as computers, laptop computers, and cellular and land-line telephones, to conduct drug trafficking operations;

j. I know that drug traffickers sometimes use Facebook messenger and text messaging interchangeably to arrange delivery of controlled substance. Sometimes, drug traffickers combine their text messaging with their Facebook messenger making Facebook messenger their default messaging application on their cellular device.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other case agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local

2

law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. §§ 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance) have been committed by Lee Hueckstaedt. There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## PROBABLE CAUSE

### A. Summary and Evidence Linking Target to Account

5. From the investigation to date, case agents believe that Lee C. Hueckstaedt was a large-scale Oxycodone dealer in the Oneida County, Wisconsin area. Case agents believe that Hueckstaedt was supplied Oxycodone by sources in Milwaukee and would frequently travel from Oneida County, Wisconsin to Milwaukee, Wisconsin to obtain Oxycodone. Interviews with Hueckstaedt's Oxycodone customers reveal that he frequently used Facebook Messenger to set up transactions for Oxycodone.

6. Case agents believe this Facebook account to be associated with the target Lee C. Hueckstaedt because Hueckstaedt's phone number is associated with this Facebook account. Case agents know the phone number to be Hueckstaedt's phone number because they have corroborated cell tower and text message information with physical surveillance. Case agents have also observed a non-publicly available "selfie" photograph of Lee C. Hueckstaedt posted on the account. Furthermore, there was a post of a photograph of the inside of Hueckstaedt's

3

residence that case agents corroborated while executing a search warrant of Hueckstaedt's residence. Finally, investigators subpoenaed Hueckstaedt's "icloud" and uncovered various information associated with the target including photographs associated with this Facebook account.

### B. Hueckstaedt's Milwaukee Source, Orvin Kay

7. In a related investigation, through numerous interviews, cell phone records, and remote video surveillance, case agents determined that two other Oxycodone dealers (Frank Lawrence and Lance Bruette) from the Oneida-County area were driving to Orvin Kay's residence located at 5441 N. 24th St., Milwaukee and picking up Oxycodone 30 mg pills.

8. On December 1, 2016, case agents interviewed Frank Lawrence. Lawrence stated Lance Bruette is the largest dealer of Oxycodone in the Rhinelander/Minocqua area. Bruette had several sources for Oxycodone in Milwaukee and introduced Lawrence to several of these sources in order for Lawrence to make trips to Milwaukee to obtain Oxycodone. Bruette's main source for Oxycodone was "Sean" (identified by photo as Orvin Andrew Kay). Kay was the largest prescription pill source Lawrence knew. Kay sold blue Oxycodone 30 mg pills for $20 each and had access to large quantities of these pills. Kay did not like to deal with people for quantities less than $2,000 (100 pills). Kay lived in Milwaukee and sold out of his home, which is located in a nicer neighborhood in Milwaukee. Kay almost always had whatever quantity of pills Lawrence or Bruette wanted.

9. Lawrence estimated that since 2012 he averaged going to Kay once a week to pick up $2,000 worth of pills (100 pills). Lawrence stated that there were periods of time that he did not go to Kay such as when he was in rehab one time for four months and another for two months. Lawrence believed Bruette went down to get pills from Kay on average at least two

4

times a week for $4,000 worth of pills (200 pills). Bruette would on average receive $2,000-$4,000 worth of pills from Kay every two to three days. There was a time when Bruette would go down for $7,000 to $8,000 worth of pills every two to three days. Several people would give Bruette money to run down and obtain pills.

10. On October 3, 2016, case agents observed a vehicle registered to Frank Lawrence parked in the driveway of Orvin Kay's residence for approximately 10 minutes.

11. Lawrence stated that that "Lee" (identified by photo as Lee C. Hueckstaedt) was another customer of Kay. Lawrence described Hueckstaedt as a large-scale oxycodone dealer in the Eagle River/Rhinelander area. Lawrence met Hueckstaedt through Lawrence's cousin "KJ" (identified by photo as Kenneth J. Fox) in order to purchase 4-5 Oxycodone 30 mg pills for $40 each on two or three prior occasions. Hueckstaedt conducted these deals with Lawrence in the driveway of Hueckstaedt's residence in Rhinelander. Lawrence had previously discussed knowing "Sean" (Orvin Kay) with Hueckstaedt. Lawrence observed Hueckstaedt leaving Kay's residence on one occasion when Lawrence was arriving to pick up Oxycodone. When inside the residence, Kay suggested to Lawrence that Lawrence do what Hueckstaedt did, and take one trip per month and purchase $7,000 to $14,000 worth of pills (350-700 pills). On that occasion, Kay indicated Hueckstaedt had picked up $14,000 worth of pills (700 pills) and Lawrence picked up $5,000 worth (250 pills). Another time, Kay asked Lawrence if he knew an individual who Hueckstaedt was sending down to pick up pills, however, Lawrence did not know this individual.

12. After executing a search warrant on Kay's residence on February 2, 2017, case agents received consent to search and review Kay's cellular telephone. Text messages (corroborated by cell tower records) show that Huecksteadt picked up the following quantities of Oxycodone 30 mg pills from Kay on the following dates:

5

- November 7, 2016: 240 Oxycodone 30 mg pills;
- November 16, 2016, 400 Oxycodone 30 mg pills;
- December 14, 2016, 611 Oxycodone 30 mg pills.

C. **Interviews with Hueckstaedt's Customers Confirm He was a Large-Scale Oxycodone Dealer who Regularly Used Facebook Messenger to Set up Oxycodone Transactions**

13. On February 8, 2017, and again on April 19, 2017, case agents interviewed Kim Squiller, who is reliable because she was providing the information against her penal interest, and has been corroborated by other parts of the investigation. She stated that she purchased on average, approximately 24 Oxycodone 30 mg pills per week from Lee for a year-and-a-half beginning in 2014 and continuing through 2015.

14. On April 14, 2017, case agents also interviewed Amanda Woodford and she reported taking three Oxycodone 30 mg pills per day that she purchased from Hueckstaedt from mid-2014 until January 2016.

15. On April 5 & 6, case agents interviewed Shannon York, who was Nicholas Rosemark's ex-girlfriend. York told case agents that Rosemark was purchasing large quantities of Oxycodone 30 mg pills on a regular basis from Hueckstaedt in September-November 2016. She stated that when Rosemark wanted to buy pills from Hueckstaedt, Hueckstaedt and Rosemark started out by communicating on Facebook messenger. York had seen Facebook messages between Rosemark and Hueckstaedt that talked about Rosemark wanting to see Hueckstaedt or six or ten "minutes," which she understood to mean 30 mg Oxycodone pills.

16. On April 19, 2017, case agents interviewed Kim Reid. She admitted to purchasing approximately seven pills every week (on average) from Hueckstaedt from June 2015-November 2016. She stated that she and Hueckstaedt mainly communicated about these

6

deals via Facebook messenger. She referred to Oxycodone 30 mg pills as "minutes" in these conversations.

17. On April 19, 2017, case agents interviewed Amie Glasscock. She admitted to purchasing 2-4 Oxycodone 30 mg pills 15-20 times from Lee Hueckstaedt in 2016. She communicated with Hueckstaedt about some of these deals via Facebook messenger.

18. On April 26, 2017, case agents interviewed Jesse Kost. He admitted to purchasing approximately 15 Oxycodone 30 mg pills per week from Lee in October-December 2015, and then again in March-July 2016. He would set up these deals either through telephone calls or through Facebook. Lee instructed him to refer to Oxycodone 30 mg pills as "minutes" on the phone and over Facebook.

19. On February 10, 2017, case agents sent Facebook a preservation notice asking Facebook to preserve the records associated with this account.

D. **Facebook Background**

20. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

21. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state,

7

Case 2:17-mj-01251-WED   Filed 06/13/17   Page 8 of 18   Document 1

and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

22. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

23. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

24. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations

8

to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

25. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

26. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

27. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

9

28. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

29. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

30. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

31. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

32. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

33. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

34. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a

10

Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

36. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

37. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts

11

between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

38. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's

state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

39. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

40. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

41. Based on the forgoing, I request that the Court issue the proposed search warrant.

42. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

43. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

13

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the Facebook user ID "Lucky Lee" https://www.facebook.com/lee.hueckstaedt that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.    Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), and is dated from June 1, 2015, through December 1, 2016, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including the full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers of "Lucky Lee" https://www.facebook.com/lee.hueckstaedt

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the account;

(l) All information about the user's access and use of Facebook Marketplace;

(m) The types of service utilized by the user;

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. Sections 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance involving Lee Hueckstaedt from June 1, 2015 through December 1, 2016, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The sale of illegal drugs (Oxycodone, sometimes referred to as "minutes")

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person who created or used the user ID, including records that help reveal the whereabouts of such person.

(e) The identity of the persons who communicated with the user ID about matters relating to illegally distributing Oxycodone, including records that help reveal their whereabouts.

3